**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

| | |
|---|---|
| ISABELLE MITURA, : | |
| : | Case No.: |
| Plaintiff, : | |
| : | |
| v. : | **AMENDED COMPLAINT** |
| : | |
| FINCO SERVICES, INC. d/b/a CURRENT, : | **Jury Trial Demanded** |
| STUART SOPP, and ALEX : | |
| SERGIYENKO, in their individual and : | |
| professional capacities, : | |
| : | |
| Defendants. : | |

-------------------------------------------------------- X

Plaintiff Isabelle Mitura ("Mitura" or "Plaintiff"), by and through her attorneys, Wigdor

LLP, as and for her Amended Complaint against Defendants Finco Services, Inc., d/b/a Current

("Current," the "Company" or "Defendant"), Stuart Sopp ("Sopp") and Alex Sergiyenko

("Sergiyenko") alleges as follows:

## PRELIMINARY STATEMENT

1.      Sometimes, even in a progressive locale like New York City, business executives

who believe themselves impervious to discriminating wind up openly discriminating against

their employees.

2.      Current, a financial technology ("FinTech") company that boasts that many of its

customers are Black, is full of executives of this kind, from Head of People Alex Sergiyenko,

who repeatedly demeaned Mitura, Current's Senior Director and Head of Talent, in front of her

colleagues as "an old Asian woman with no kids," to CEO Stuart Sopp, who expressed

frustration at having to interview too many Indians for the Chief Risk Officer position, and

extolled the virtues of the former British Empire in front of employees, many of whom hail from

countries that had been violently colonized.

1

3.      After Mitura was diagnosed with breast cancer and had to take a protected leave for surgery and recovery, and only approximately two weeks before she was scheduled to return from leave, Sergiyenko dismissed her, telling her openly that her replacements had built relationships within the company while she was on leave—an open admission that he made his decision because of her leave status.  Sergiyenko was no doubt also motivated by Mitura's numerous complaints about Current's open discrimination against its employees, as has his view that the jobs of white men under forty should be protected before all others.

4.      But Current is not above the law just because its executives pay lip service to social justice causes, or because many of its customers are Black, as Sopp is fond of repeating to press outlets, and Mitura now brings this claim to vindicate her rights and expose the rampant discrimination at Current under the antidiscrimination and antiretaliation provisions of the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"); New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"); Equal Pay Act, 29 U.S.C. § 206 *et seq.* ("EPA") and New York State Pay Equity Law, N.Y. Lab. Law § 194 *et seq.* ("NYSPEL").

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law.  This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

6.      Plaintiff resides in Texas and was employed in New York City.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

8.      The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is a complete diversity of citizenship among the parties and this action involves an amount in controversy in excess of $75,000, excluding interests and costs.

## ADMINISTRATIVE PROCEDURES

9.      Concurrent with this complaint, Plaintiff has filed a charge ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of 42 U.S.C. § 2000e *et seq*, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act 42 U.S.C. § 12112 ("ADA"), and Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., on April 7, 2023. We are awaiting a Notice of Right to Sue.

10.     Pursuant to NYCHRL § 8-502, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel.

## PARTIES

11.     Plaintiff is the former Head of Talent of Finco Services of Current.  At all relevant times, Plaintiff was an "employee" and/or "eligible employee" under all applicable statutes. Plaintiff resides in Texas and is domiciled there.

12.     Defendant Current is a Delaware-registered company with its headquarters at 45 West 18th Street, New York, NY, 10011.  At all relevant times, Defendant was an "employer" and/or "covered employer" under all applicable statutes.

13.     Defendant Stuart Sopp is on information and belief a resident of New York and is domiciled there.  At all relevant times, Defendant Sopp was an "employer" and/or "covered employer" under all applicable statutes.  At all relevant times, he worked in Current's New York City office.

14.     Defendant Alex Sergiyenko is on information and belief a resident of New York and is domiciled there.  At all relevant times, Defendant Sergiyenko was an "employer" and/or "covered employer" under all applicable statutes.  At all relevant times, he worked in Current's New York City office.

**FACTS**

**I.     MITURA JOINS CURRENT**

15.     Mitura, who is of Korean descent and identifies and presents as an Asian woman, is a highly experienced and successful tech recruiter with 23 years of experience, and a track record of finding candidates for difficult-to-fill roles in the tech industry, where it is always a seller's market for top talent.

16.     Mitura graduated from The University of Notre Dame in 1996 with a degree in government and international relations.  She continued her education at the University of Portland where she earned a Master's and graduated Cum Laude, with honors, in 1998.  She began her career in tech recruiting at Trilogy Software as a senior technical recruiter.

17.     She remained on an upward trajectory at her subsequent jobs.  In 2000 she joined Onyx, a CRM software company, where she received an exceptional stock grant and was identified as a top performer.

18.     After these major achievements, in 2002, Mitura joined HireStarter in 2004, where she was top biller.

19.     After Google, Mitura joined Zynga, a social games development company. When Mitura started, Zynga had fewer than 200 employees. She helped grow the company to 4,000 employees worldwide and was the only recruiter that placed new hires across every single department of the company. Mitura singlehandedly developed, executed, and managed the strategy to hire an entirely new European office consisting of 30 new hires.

20.     At Zynga, Mitura also met and worked with Defendant Sergiyenko for the first time, and the two began a cordial working relationship.

21.     After these major achievements, Mitura switched back to outside recruitment by returning to HireStarter, where she led international recruiting and was again top biller.

22.     After HireStarter, Mitura founded her own tech recruiting company, the Hiring Bar. While there, Mitura came back into contact with Sergiyenko, whom she helped fill roles at a new company he had begun working for, a FinTech firm called Current. On numerous occasions, Sergiyenko tried to recruit her to join Current but, for a time, Mitura did not see much opportunity in the role he was offering.

23.     In 2019, a former client of Mitura's saw her value in this space and recommended her to be hired at a different FinTech firm, Earnin. At Earnin, Mitura hired employees, managed direct reports, and created a companywide training program, while reducing costs. As she had throughout her career, Mitura earned numerous salary increases, promotions and bonuses.

24.     In 2021, Sergiyenko approached her once again, this time offering to hire her as a Senior Director and Head of Talent at Current.

25.     By 2021, Mitura was well versed in technical, non-technical and executive recruiting. Moreover, the markets for technical and executive hires are very competitive; almost

any sought-after engineer or executive would require significant efforts to court, and such courting requires fluency in technical and business concepts, which Mitura has.

26.     From her time in the tech industry, where she held numerous leadership and recruitment roles, including at Earnin, Mitura had exactly the right expertise to lead recruitment searches at all levels up to the C-Suite.

27.     Mitura's background made her a perfect fit for Current.

28.     Mitura was also excited by Current's product offering, its prospects for growth, and its mission.

29.     Current is one of several FinTech companies disrupting consumer banking by offering products like checking and savings accounts that can be difficult to access at traditional banks, which often set minimums for opening accounts or accessing higher interest rates.

30.     Current is one of the most successful corporations in the FinTech space. Current's customer base surged in the first two months of the Covid-19 pandemic.

31.      In April 2021, it was reported by CNBC Finance that the company had tripled its valuation in five months to $2.2 billion after respected venture capital firm Andreessen Horowitz took a large stake as part of a fundraising round of $220 million.

32.     Not only did Current triple its valuation, it tripled its customer base, from one million to three million users.

33.     Current's product resonates with recent generations, whose members are used to accessing retail services online, and are rapidly migrating from brick-and-mortar banks to digital banking service providers such as Current.  Forbes reported at the end of 2022 that Current was "a Big Winner in 2021" and the second most successful digital banking platform after Chime.

34.     Current has done an overall better job than its main competitor, Chime, in securing Gen Z customers and offering attractive new products like cash-back rewards and high-interest rate savings accounts.

35.     Current is well-funded and has access to reserves of cash.

36.     Part of the excitement around Current, and part of its marketing pitch to young people, is that it fosters equity in banking by bringing banking services to young people and Black Americans, two groups who are often shut out of banking services by account minimums and overdraft fees at traditional banks.

37.     Sopp, for instance, is fond of boasting in press releases and interviews that "Half of Current's customers are Black."

38.     As Mitura would learn, this is no more than a marketing pitch.  Internally, when it believes it will face no scrutiny, Current maintains a discriminatory workplace where workers are consistently harassed, subjected to unfair and unequal terms and conditions of employment, and dismissed because of their race, sex and legally-protected activities.

39.     Of course, Mitura had much higher hopes when she first interviewed.  After her interview, and excited by Current's growth and the role on offer, Mitura decided to accept, reporting to her old business acquaintance Sergiyenko.

40.     Doing so required her to move from Austin, Texas, to New York City, where Current is located.

41.     Mitura worked in New York City until August of 2022, and it was understood at all times during her employment that she would continue to work permanently in New York City.

42.     All of the events described below occurred in Current's New York City office, where Mitura worked at all times (until August 2022).

## II.     MITURA FACES CURRENT'S DISCRIMINATORY CULTURE

43.     At Current, Mitura was tasked with recruiting and hiring for specialized roles across the company, which she did skillfully.

44.     Without Mitura, Current would not have been recognized with a certification from Great Place to Work, which was a branding initiative that Mitura organized and directed.

45.     As part of this effort, she hired a direct report (a woman).

46.     Mitura identified and cut wasteful spending, including having Sergiyenko eliminate unneeded licenses for an email recruitment software that cost thousands of dollars a month, but, as far as she could tell, was barely used.

47.     Sergiyenko also insisted on using expensive outside recruitment firms, even though he had staffed a comprehensive internal recruiting operation, which included Mitura.

48.     Soon after Mitura joined, and in addition to her effort to brand Current in a more attractive way to potential recruits, she began pushing Current to take up DEI trainings, and to begin monitoring racial and gender diversity.  Mitura understood this to be an integral part of her role.

49.     Indeed, "DEI" had been a part of the job description Sergiyenko had shared with her.

50.     Mitura immediately began planning trainings to prevent unconscious bias in interviews.

51. She also put in place a system, with the help of her direct report, to monitor diversity statistics to ensure that upper management would be aware of any business practices that might impact the company's ability to attract and retain diverse talent.

52. The responses she received from Sopp and Chief Technology Officer and Co-Founder Trevor Marshall demonstrate Current's willingness to put the personal opinions of white male leadership ahead of considerations of fairness.

53. Sopp opposed Mitura's equality initiatives because, as he told Sergiyenko, he thought the company did not need them, and Sergiyenko likewise disparaged equality initiatives as "tokenism" and "virtue signaling."

54. Marshall also agreed that Current did not "need DEI."

55. When Mitura attempted to hold a training on unconscious bias—again, an industry standard—in Fall of 2021, Sopp and VP of Finance David Kilin simply failed to attend and never gave Mitura any indication as to why they ignored her invitation.

56. Meanwhile, Sopp made no mystery of the fact that he considered race when making hiring decisions. For instance, in late 2021 and early 2022, Mitura, Sergiyenko and Sopp were considering candidates for the position of Chief Risk Officer.

57. During one meeting about candidates, Sopp remarked that the candidates all "went to the Indian Institutes of Technology."

58. Sopp meant that he wished he did not have to hire a brown-skinned employee of Indian origin for this role.

59. Racialized and misogynist attitudes permeated the company and impacted Mitura, too. Starting soon after she began and continuing until shortly before she went on leave,

Sergiyenko often remarked, sometimes in front of others, that Mitura was "an old Asian with no kids."

60.     Sergiyenko said this in a deliberately mean-spirited manner, meant to put Mitura in her place and convey her place in Current's hierarchy.  The statement also showed that he considered sex, race, age and familial status when dealing with subordinates. Sergiyenko made these comments in Current's New York City office.

61.     Mitura did not appreciate being constantly made aware of her sex, race, age and familial status in the workplace.  She believed, and took the words to mean, that Sergiyenko took note of Mitura's sex, race, age and familial status as her manager, and judged her for these qualities.

62.     Mitura protested Sergiyenko's discriminatory conduct to the New York City-based HR manager in Spring 2022.

63.     At this time, the HR manager revealed that Sergiyenko had previously disparaged another employee for her ethnic background.

64.     Sergiyenko was purportedly made to address his racist behavior with the employee he disparaged, but he continued to discriminate.

65.     Current's culture of bigotry, misogyny and discrimination weighed heavily on Mitura.  With its atmosphere of open insult and discrimination, she felt herself a second-class employee.

66.     As detailed below, Mitura faced sex, race and age discrimination on numerous other occasions as well.

67.     Since they were two of the only women in upper management, Mitura often confided in the General Counsel (a woman) about her experience.  It appeared to Mitura that the

culture on the executive team, which included Stuart Sopp, was extremely hostile and a boys' club where the General Counsel's experience was undervalued, her advice was not taken seriously and where, in short, she was made to feel like an outsider.

68.    It is clear from her profile that the General Counsel was hired as a token woman and that she was made to feel it.

69.    In September 2021, as reported by Bloomberg Law, Current went out of its way, and no doubt paid a premium price, to poach their new General Counsel from Shopify Inc.

70.    To say she was eminently qualified is an understatement.  Her legal and business experience place her at the top of her field.  She graduated as Valedictorian from Brooklyn Law School, clerked for federal district and appeals courts, and made her way up the legal compliance and strategy ranks at various corporations for 21 years before Current poached her.  Of course, a leader in her position is not just a lawyer, but a business strategist and compliance and regulatory expert.  This experience is indispensable to a FinTech startup like Current, whose entire business depends on proper and efficient compliance with finance and banking regulations.

71.    Despite this acumen and leadership experience, Sopp and his executive team did not take her seriously, as they generally undervalued the efforts of all the women in their employ. She left Current after little more than a year.

### III.    MITURA COMPLAINS ABOUT THE DISCRIMINATORY IMPACT OF THE JUNE 2022 LAYOFFS AND ABOUT OTHER INSTANCES OF <u>DISCRIMINATION</u>

72.    As a manager, Mitura was made aware of multiple incidents of discriminatory pay, and consistently complained about them to Sergiyenko.

73.    In January 2022, through her efforts to monitor diversity and equity within the company, Mitura became aware of a sex-based pay gap, which she documented.

74.     In particular, she learned that Current paid a female Senior Director reporting to the VP of Marketing, less than a man with the same title reporting to the same manager, even though the female Senior Director had far more experience and was a far better performer.

75.     Moreover, the comparable man did not actually manage anyone.

76.     Nevertheless, Current paid the comparable man far more per year than it paid the woman.

77.     Mitura protested the pay disparity to Sergiyenko. But Current did not equalize the female employee's pay.

78.     Rather, the Company gave the man a new role at the same title in a different group and continued his inflated compensation.

79.     This was an obvious and illegal attempt to hide the pay disparity rather than fix it.

80.     Mitura was also aware of the previous hiring of a man as an influencer marketer.

81.     He had very little experience (perhaps one year).

82.     His role was also not important, mostly involving mailing Current-branded merchandise to allied influencers.

83.     Meanwhile, Mitura's direct report, a woman, had much more experience, seniority and performed more complex tasks in the same role.

84.     Nevertheless, she earned far less per year than the comparable man.

85.     Mitura also complained about this pay disparity early in 2022, and, once again, Sergiyenko ignored Mitura's complaints about this pay disparity.

86.     Later, in July 2022, Mitura learned that Current would be laying off a group of employees.

87.     Sergiyenko, in consultation with Sopp and the executive team, determined who would be laid off

88.     Soon after the layoffs, Mitura, who was still tracking DEI statistics, noticed that the proportion of women and people of color as compared to white men had dropped markedly companywide.  Based on observations of whom had been selected for termination, Mitura believed that this was not coincidence, but that Current had used the prospect of an economic downturn to justify weeding out employees it considered undesirable, at least in some cases.  It did not appear to Mitura that the layoffs could be justified by Current's financials.

89.     The disparate impact in this and later hiring decisions also shows that, in spite of all their lip service, when Current's leadership perceived a need to downsize, they went out of their way to protect the roles of men and white men under forty, even when doing so made no economic sense, and even though they might have previously (when they thought they had enough money) chosen to hire women and members of minority groups.

90.     Indeed, shortly after this layoff, Sopp approved spending on an office-patio redecoration for the New York City office.

91.     This was lavish spending for a company that claimed to have financial issues.

92.     Surprised by all this, Mitura pointed out the discriminatory impact to Sergiyenko and asked "did legal look at this?"

93.     Sergiyenko, unperturbed, replied, simply "no."

94.     As Mitura later confirmed with the General Counsel, the legal department had not in fact reviewed the layoff decision.

95.     Sergiyenko's admission is remarkable in several respects.  First, of course, it shows that Current does not take its legal responsibility to prevent discrimination seriously.  Any

reasonably sophisticated company would have realized that a disparate impact of this kind can automatically open a company to liability unless the layoffs have been justified and the reasons carefully documented. The lack of oversight bespeaks a corporate administration that simply does not care whether it violates applicable antidiscrimination law. Second, it is remarkable because the relevant legal advice in this case would have come from one of the only women on the executive team: the General Counsel. It is telling that Sopp would hire a woman as General Counsel, to serve as one of the few women on his executive team, and then deliberately ignore her (indeed, apparently not even think to seek her advice) in exactly the kind of situation that would cry out for legal review. It bespeaks a culture of tokenism where women are sidelined and disrespected.

## IV.   MITURA IS HARASSED BASED ON HER SEX, AGE AND RACE

96.     As in many tech workplaces, Current, while believing itself at the forefront of social justice, operates a workplace based on unwritten rules of sex and racial caste.

97.     For instance, it was impossible to ignore that the support and operations staff were heavily female, while the business and development teams were skewed male.

98.     Moreover, the second floor of the New York City office, which contained the fraud and customer support teams, was heavily skewed towards people of color. Tellingly, Sopp worked on the first floor, and to all appearances he relegated the people of color who worked for him to a floor where he did not have to see them—very few people of color worked on the first floor with him. His system of dividing employees by floor had the appearance of segregating his employees by race.

99.     In addition to calling her "an old Asian woman with no kids," Sergiyenko constantly disparaged Mitura based on both her sex and her race, often in front of her team or in front of colleagues in New York City.

100.    Sergiyenko made a statement openly disparaging of Mitura's sex, and sometimes her race or age as well, frequently, and sometimes as often as weekly, during Mitura's entire tenure at Current, amounting to dozens if not hundreds of disparaging remarks.

101.    These weekly statements included disparaging her as "an old woman," an "old Asian woman," a "Korean woman" and a "single woman."

102.    On one occasion, Mitura pointed out to Sergiyenko that a peer company had just introduced a menstruation leave policy.  This is an up-to-the-minute HR policy issue—for instance, Spain recently enacted a menstruation leave policy for all employees in the country— and a topic that Mitura raised in her capacity as a recruiter who had a mandate to consider the policies that would best attract talent.

103.    Sergiyenko's offensive and unprofessional response was to ask Mitura, "Do you even still menstruate, Isabelle?"  This was another insult aimed at Isabelle's sex and age.[1]

104.    Sopp too reinforced the atmosphere of sex and racial hostility.  For instance, during "demo days," when Current's development teams would present their recent project launches to the rest of the company, Sopp regularly praised and complimented the male members of the teams, leaving the women to feel invisible.

105.    Sopp also publicly disparaged Mitura based on the stereotype of the compliant and servile Asian woman.  During a company-wide meeting, after making a comment about Sergiyenko's leadership, Sopp added that "all Isabelle does is laugh and nod her head and

---

[1]     Again, all of this harassment occurred in Current's New York City office.

agree," undermining her and making it appear as though her only contribution to the company came through servility towards a white male.

106.    Through his words and actions, Sopp conveyed the sexual and racial hostility of Current as a company, and the prism through which it officially viewed its employees, weighed their worth, and, ultimately, made decisions about them.

## V.    SERGIYENKO ATTEMPTS TO DISSUADE MITURA FROM EXERCISING HER FMLA RIGHTS

107.    In June of 2022, Mitura was diagnosed with breast cancer.  This news was especially devastating to Mitura who was widowed at age 27 when her husband died of brain cancer.  Mitura at first believed that she, too, had been delivered a death sentence.

108.    Mitura informed Sergiyenko of the diagnosis and further explained that she would need time off for surgery and recovery.

109.    Sergiyenko's inappropriate response to hearing about this diagnosis was to ask Mitura whether she had gotten breast cancer because her "breasts were so large."

110.    At the end of June 2022, Mitura requested FMLA leave, giving 30 days' notice of her intention to take leave.

111.    She also requested an accommodation to be allowed to work from home.

112.    Sergiyenko, however, told Mitura that she did not need to use FMLA leave.

113.    He encouraged her to use unlimited PTO time instead.

114.    In short, Sergiyenko sought to strip Mitura of her job-protection rights by rebranding her medical leave as PTO.

115.    He also induced her by purporting to give her six months of paid leave through January 2023, without ever providing her with FMLA-compliant paperwork.

116.    By this time, however, Mitura more than qualified for FMLA leave, as she had been working at Current for over a year, and for far more than 1,250 hours.

117.    Separately, while Mitura planned to return to Texas to take her leave and receive medical treatment, she agreed with Sergiyenko that she would afterwards return to New York City to work at Current's offices, and Sergiyenko promised she would be allowed to do so.

## VI.    CURRENT FIRES MITURA

118.    In August of 2022, Mitura went on leave to receive treatment for breast cancer. Mitura's doctors discovered during two MRIs two other spots that could have been indicative of breast cancer.  Luckily, they were found to be benign.  Finally, in November 2022, Mitura underwent surgery to remove the malignant tumor.

119.    In January 2023, two weeks before Mitura was scheduled to return to work, Sergiyenko terminated Mitura's employment.

120.    Initially, Sergiyenko claimed that Mitura was the victim of a new round of layoffs.

121.    Mitura pressed Sergiyenko about why she had been selected.  After all, there was no one on the human resources team with similar or sufficient expertise to do the sort of executive and technical recruiting that she did.

122.    In response, Sergiyenko eventually admitted that he chose Mitura because of her leave.  According to Sergiyenko, the employees who replaced Mitura "had been developing relationships while she was on leave."

123.    Sergiyenko also claimed that Mitura was too expensive and "the company's cash position had changed."  But this, too, made no sense.

124. In total, two recruiters with a technical-recruiting skillset reported to Mitura on the recruiting team.

125. One, a man, held a recruiting manager title and was paid accordingly at Sergiyenko's behest.

126. Nevertheless, he did not do any management work.

127. While he was an adequate recruiter, he also underperformed as a manager, because there was no true management work for him to do—Sergiyenko had given him the "manager" title gratuitously.

128. His pay was therefore inflated compared to what he deserved.

129. There were also two non-technical recruiters on Mitura's team.

130. While they, too, were proficient, Current has a relatively small workforce and its business is not driven by non-technical roles, and this side of the recruiting department was clearly also overstaffed.

131. By contrast, Mitura had the full recruitment skillset—she could recruit both technical and non-technical roles.

132. Mitura was also the only one with executive recruiting experience, which is its own skillset.

133. Moreover, she could have done the work of this entire team on her own, given Current's relatively small size, and the extremely low intensity of its non-technical recruiting.

134. If the decision had truly been driven by cost, the more rational move would have been to consolidate the team by keeping Mitura (who had a full recruitment skillset).

135. Nor is Current actually short on cash.

136.     It is public knowledge that Current had raised $355,000,000 within a year of April 2021, around when Mitura was hired.

137.     Beyond this, as Mitura found out from Sergiyenko, Current paid tens or hundreds of thousands of dollars for a lavish boat party for its employees in the Summer of 2022.

138.      It also paid, as she also found out from Sergiyenko, another several hundred thousand dollars for a Christmas party later that year

139.     None of this is even to mention the unnecessary spending on software Mitura had flagged earlier and the office redecoration of Summer 2022.

140.     Moreover, in addition to three culinary workers provided by WeWork (from whom Current rents), Current pays an additional three culinary staff members, and two additional front-desk staff members who primarily perform culinary-related duties.

141.     This is lavish spending, considering that Current caters in its meals.

142.     Moreover, this current layoff is a part of a broader scheme of discrimination that began with the June 2022 layoffs, and perhaps even earlier than that.

143.     Those earlier layoffs disproportionately impacted women, people of color and older workers.

144.     Mitura knew this because she monitored the diversity statistics at Current.

145.     In addition, specific individual decisions did not make sense from a business perspective, but were more plausibly justified by the race or sex of the person chosen for the layoff.

146.     And, in the January 2023 layoff, Mitura knows, apart from herself, of a white coordinator who was kept in a role that had become superfluous, instead of a Black coordinator with very similar experience.

147. Whatever Sergiyenko's prior motives in hiring Mitura, it is clear that once he was told to cut personnel costs he decided to protect the jobs of white men under forty and fire people like Mitura.

148. It had been easy for Sergiyenko and Current to pay lip service to diversity in hiring when they thought that Current was flush with money.

149. When they perceived that resources were more limited, they reverted to their default discriminatory mindset.

150. Sopp encouraged Sergiyenko in discriminating and retaliating, by participating in deciding who would be laid off and by approving the final lists of terminated employees.

151. Not only did Current single out Mitura for taking FMLA leave and for her protected complaints, but Sopp and Sergiyenko's discriminatory layoff policy, as demonstrated by their stated attitudes and the prior layoffs, also caused and motivated Mitura's termination.

152. Current offered Mitura a severance package, but under circumstances suggesting that it was conscious of wrongdoing and eager to pressure employees to take the severance and waive their rights.

153. First, while the layoff was announced towards the very end of January, the impacted employees were told that they must accept on February 1, 2023, or have their health insurance cut off on the spot, while, if they accepted, Current would continue paying for their health insurance for another five months.

154. This is a remarkable pressure tactic. When it comes to Mitura, and to other employees with medical conditions, it is also callous and cruel, since Mitura continues to pay for expensive interventions as a result of her breast-cancer treatments, including a mammogram which she was scheduled for late February.

155.	Second, Current deliberately flouted Mitura's legal rights in the proffered severance.

156.	Since a group of employees was laid off, Current was required to give Mitura (and all impacted employees) 45 days to consider their severance and was also required to provide certain information about the job title and the age of the employees impacted (pursuant to the Older Workers Benefit Protection Act, the "OWBPA").

157.	Instead, Current gave Mitura 21 days to decide and withheld the requisite demographic information.

158.	After Mitura pointed out her right to a 45-day consideration period, Current relented and gave her an extension, without any explanation of why they had flouted her rights to begin with, basically admitting they had violated the law.

## VII.	CURRENT TRIES TO DISUADE MITURA FROM EXERCISING HER RIGHTS

159.	On April 3, 2023, Current learned that Mitura intended to file her employment claims, including claims for sexual harassment, in court.

160.	The Company retaliated immediately by threatening Mitura.

161.	First, Current threatened to seek sanctions against Mitura for her forthcoming court filing, claiming that Mitura was forced to bring her claims in a secret arbitration proceeding.

162.	But the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "EFAA"), 9 U.S.C. §§ 401-02, renders any arbitration agreement unenforceable "with respect to a case which is filed under Federal, Tribal, or State law and relates to . . . a sexual harassment dispute." Id. at § 402(a). As such, Current was aware that any "predispute arbitration agreement" Mitura signed was "[in]valid" and "[un]enforceable" as to this "case"

because Mitura was alleging a "sexual harassment" claim under "State law."  Id.  The Company nonetheless threatened to punish Mitura with sanctions to dissuade her from exercising her right to bring her claims in court.[2]

163.    Second, Current threatened to countersue Mitura, claiming that she would be in breach of her confidentiality obligations and unspecified "applicable laws" by disclosing "salaries" in her court complaint.

164.    This, too, was frivolous.  Compensation information is not confidential where, as here, an employee brings a claim related to pay equity.  Indeed, both New York State and New York City recently enacted pay transparency laws in an attempt to prevent employers like Current from perpetuating pay gaps.

165.    Once again, Current threatened Mitura with a frivolous counterclaim in an attempt to dissuade her from exercising her rights.[3]

---

[2]      Current was made aware that the EFAA precluded forced arbitration.  When asked what good faith basis it had to seek to compel arbitration or seek sanctions, Current made no attempt to address the applicable statute.  Rather, it cited only the "clarity of the language in the arbitration agreement."  This argument is patently frivolous.  The EFAA negates any attempt to force arbitration of "cases" involving "sexual harassment" regardless of the language of the underlying arbitration agreement.  9 U.S.C. § 402(a).

[3]      In abundance of caution, Mitura has omitted specific salary information from this complaint.

## **FIRST CAUSE OF ACTION**
### **(Interference and Retaliation under the FMLA)**
### *Against all Defendants*

166.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

167.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA.  Similarly, Defendants were and are each a "covered employer" within the meaning of the FMLA.

168.    By the actions described above, among others, Defendants interfered with Plaintiff's rights under the FMLA and retaliated against Plaintiff for exercising those rights.

169.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

170.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

171.    Defendants' unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

## **SECOND CAUSE OF ACTION**
### **(Discrimination and Retaliation in Violation of Section 1981)**
### *Against all Defendants*

172.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

173.    By the acts described above, Defendants discriminated against Plaintiff based on her race in violation of Section 1981.

174.    By the acts described above, Defendants retaliated against Plaintiff after she made protected complaints of race discrimination that violated Section 1981.

175.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

176.    Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

### THIRD CAUSE OF ACTION
### (Retaliation in Violation of the Federal Equal Pay Act)
### *Against all Defendants*

177.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

178.    By the acts described above, Defendants retaliated against Plaintiff based on her protected complaints about gender-unequal compensation at Current.

179.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

180.    Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the New York Pay Equity Law)
### *Against all Defendants*

181.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

182.    By the acts described above, Defendant retaliated against Plaintiff based on her protected complaints about sex-unequal compensation at Current.

183.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

184.    Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## FIFTH CAUSE OF ACTION
### (Discrimination, Harassment and Retaliation in Violation of the NYSHRL)
### *Against all Defendants*

185.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

186.    By the acts described above, Defendants discriminated against Plaintiff based on her race, sex and age.

187.    Defendants also retaliated against Plaintiff for her protected complaints about race, sex, age and familial status discrimination, and because she sought an accommodation.

188.    The discrimination included creating a hostile work environment based on Mitura's sex, race and age.

189.    It also included the adopting of facially neutral termination policies with a disproportionate impact on women and people of color.

190.     In addition to their direct individual liability, Defendants Sopp and Sergiyenko are also liable for aiding and abetting discrimination and retaliation by Current.

191.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

192.     Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

**SIXTH CAUSE OF ACTION**
**(Discrimination, Harassment, Retaliation and Interference in Violation of the NYCHRL)**
***Against all Defendants***

193.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

194.     By the acts described above, Defendants discriminated against Plaintiff based on her race, sex and age.

195.     Through their discrimination and retaliation, the Defendants also interfered with Mitura's protected rights under the NYCHRL.

196.     The discrimination included creating a hostile work environment based on Mitura's sex, race and age.

197.     It also included the adopting of facially neutral termination policies with a disproportionate impact on women and people of color.

198.     In addition to their direct individual liability, Defendants Sopp and Sergiyenko are also liable for aiding and abetting discrimination and retaliation by Current, and for interfering with Mitura's protected rights.

199. Defendants also retaliated against Plaintiff for her protected complaints about race, sex, age and caregiver status discrimination, and because she sought an accommodation.

200. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

201. Defendants' conduct was willful and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against the Defendants for the following relief:

A. A declaratory judgment that Defendants violated federal, state and city laws;

B. An award of economic damages;

C. An award of compensatory damages;

D. An award of punitive damages;

E. An award of liquidated damages;

F. Prejudgment interest on all amounts due;

G. An award of reasonable attorneys' fees and costs; and

H. Such other and further relief as the Court may deem just and proper.

Dated: June 27, 2023
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
      Valdi Licul
      John S. Crain

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
jcrain@wigdorlaw.com

*Counsel for Plaintiff*